UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

JASMINE FOX, KARIVA CROSS-MCKNIGHT,
MANEKA DUFFY, DOMINIQUE FLYNN, and
LOREN PARKER JR.

Defendants.

**MEMORANDUM & ORDER**

**23-CR-227 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court is the fully briefed motion brought by Defendants Jasmine Fox, Dominique Flynn, and Loren Parker [1] to suppress "all evidence obtained as a result of the unconstitutional manual search of Ms. Fox's iPhone 11 Pro ("cellphone" or "phone"), including, but not limited to, the ensuing forensic search of her cellphone and laptop and all fruits thereof." (Mot. (Dkt. 80) at 1; Opp. (Dkt. 86); Reply (Dkt. 88).)

As detailed herein, Homeland Securities Investigations Agent Edward Shapiro tracked Defendant Fox's international travel for the apparent purpose of seizing her phone and laptop at the border. The devices were then seized at Miami International Airport and sent to New York, where he conducted a warrantless manual search of the phone days later for evidence of a domestic financial crime. Twenty-seven days after the seizure, Shapiro used evidence gathered from this search to apply for a warrant to perform a forensic search of the phone and laptop. The Government

---

[1] Defendants Parker and Flynn joined Defendant Fox's motion, asserting privacy interests in their codefendants' phone. (*See* Parker Mot. (Dkt. 81); Flynn Mot. (Dkt. 84); Decl. of Dominique Flynn (Dkt. 84-1).) The Indictment named two additional defendants who did not join the present motion, Defendant Kariva Cross-Mcknight who pleaded guilty on March 5, 2024, (Dkt. 78), and Defendant Maneka Duffy who remains in the case.

argues that this was permissible under the Fourth Amendment and a valid application of the border-search exception.

The court finds that Agent Shapiro violated Defendant Fox's Fourth Amendment rights. Further, the good faith exception to the exclusionary rule does not apply because Agent Shapiro acted in reckless disregard of Ms. Fox's Fourth Amendment rights when (1) directing the seizure of the phone and searching it, and (2) when applying for the warrant to conduct the forensic search once in possession of the phone, due to his omission of critical details in his affidavit supporting the warrant application and his unreasonable delay in applying for the warrant. Defendant Fox's motion is therefore GRANTED in full. Because Defendants Flynn and Parker do not have standing to assert a violation of their own rights, however, their motions are DENIED.

## I.   BACKGROUND[2]

In July 2021, Homeland Security Investigations ("HSI")[3] Agent Edward Shapiro began inquiring about criminal activity, including fraud, of multiple employees working at LaGuardia Airport

---

[2] The facts are generally derived from declarations and affidavits provided for the present motion. Defendants provided a declaration from Defendant Fox. (Ex. 1 to Mot. ("Fox Decl.") (Dkt. 80-1).) The Government provided declarations from: HSI Agent Edward Shapiro, (*see generally* Ex. 1 to Opp. ("Shapiro Decl.") (Dkt. 86-1) ¶ 3); HSI Agent Christopher Bondura, who was based at Miami International Airport ("MIA") and was assigned duties that included "executing passenger-related requests made by other HSI offices" (Ex. 2 to Opp. ("Bondura Decl.") (Dkt. 86-2) ¶ 2); and CBP Officer Taís Sciaroni, who worked at MIA and was part of Fox's interview while detained at MIA. (Ex. 3 to Opp ("Sciaroni Decl.") (Dkt. 86-3) ¶ 2.) The court also draws from the affidavit submitted by Shapiro in support of his warrant application. (Aff. in Support of Warrant (Dkt. 80-5).)

[3] HSI is a law enforcement agency within the United States Department of Homeland Security. (Shapiro Decl. ¶ 1.) At all times relevant to this motion, Shapiro was in HSI's "Internal Conspiracy Group" at LaGuardia Airport. (*Id.* ¶ 3.)

("LGA"), including individuals employed by Delta Air Lines. (Shapiro Decl. ¶ 5.) This led Shapiro to open an investigation at HSI on September 21, 2021. (*Id.*; *see also* Ex. 4 to Mot. ("HSI Report of Investigation") (Dkt. 80-4) at 1.)[4] As part of the investigation, Shapiro issued administrative summonses to multiple PPP lenders for information associated with LGA employees. (Shapiro Decl. ¶ 6; Aff. in Support of Warrant ¶¶ 10-11.) Based upon a review of open-source records and other law enforcement evidence gathered before November 2021, Shapiro came to believe that Fox, a flight attendant who worked for Delta, and her husband, were engaged in a Paycheck Protection Program ("PPP") fraud and a money laundering scheme. (Shapiro Decl. ¶¶ 7-11.) The suspicions were based on Fox applying for and receiving at least one PPP loan for a business that was incorporated in 2018, dissolved in 2019 and reinstated in 2020 shortly before filing for a PPP loan. (*Id.* ¶ 7) The suspicions were also supported by evidence that an uncharged individual received multiple money transfers from LGA employees who successfully applied for PPP loans. (*Id.* ¶ 9.)

Shapiro then created a law enforcement record "in or around October 2021" to receive notifications about Fox's travel. (*Id.* ¶ 11.) He subsequently received a notification in mid-November that Fox was traveling to Colombia and returning on November 13, 2021, landing at Miami International Airport ("MIA"). (*Id.* ¶¶ 11-12.) After receiving this notification, Shapiro contacted HSI Agent Christopher Bondura, who was working at MIA. (*Id.* ¶¶ 11-14; *see also* Bondura Decl. ¶ 4.) Shapiro told Bondura that Fox and her co-traveler were part of an ongoing fraud investigation, (Bondura Decl. ¶ 4), and asked that they be inspected upon their

---

[4] The HSI Report of Investigation and Shapiro's Declaration imply that Fox was the subject of the investigation at this time, but they are not explicit that she was, leaving open the possibility she became the subject of the investigation at some point in October, closer in time to when Shapiro created a record to be alerted of her travel.

arrival and, "if any devices belonging to Ms. Fox were found, that HSI in Miami send those devices to [Shapiro] pursuant to a border search." (Shapiro Decl. ¶ 12.) Agent Bondura relayed this message to CBP officers at MIA, and CBP agreed to conduct the search upon Fox's arrival. (Bondura Decl. ¶ 5.)

On November 13, 2021, Fox arrived at MIA from Cali, Colombia, traveling with her friend. (*See* Shapiro Decl. ¶¶ 11-13; Fox Decl. ¶ 1.) Fox had an unexpired passport bearing her name and photo, (CBP Media Report (Dkt 80-2)), and CBP performed the full set of computer system queries "with negative results for wants or warrants." (*Id.*; *see also* Reply at 2 (noting that Fox did not have a criminal history).) As she went through customs, however, an officer referred Fox for a secondary inspection pursuant to the request from HSI. (Sciaroni Decl. ¶ 13; Fox Decl. ¶ 2; Bondura Decl. ¶¶ 5-6.) She was then taken to a windowless room to be questioned by CBP Officer Taís Sciaroni. (Fox Decl. ¶ 4; Sciaroni Decl. ¶¶ 13-15.) In her interaction with CBP officers, Fox was cooperative, polite and professional. (Sciaroni Decl. ¶ 21.) HSI Agent Bondura was present at MIA, waiting in the vicinity of Defendant Fox's interview room in the secondary inspection area, but he asked that HSI's presence at the airport not be revealed to Ms. Fox. (Bondura Decl. ¶¶ 5-6.)

The parties dispute multiple details of the questioning, including: whether the door to the interview room was open or closed, (*compare* Fox Decl. ¶¶ 4, 7 (door remained closed during the questioning) *with* Sciaroni Decl. ¶ 15 (door was open during the questioning)) and whether Fox gave CBP her passcodes to enter the devices voluntarily. (*Compare* Sciaroni Decl. ¶ 20 *with* Fox Decl. ¶¶ 8-10.)[5] Neither party, however, contends that CBP officers asked questions related to the ongoing fraud investigation,

---

[5] While stating that the passcodes were given by Fox "voluntarily" (Sciaroni Decl. ¶ 20), Officer Sciaoni does not state that the devices themselves

(*see generally* Fox Decl.; Sciaroni Decl.) or that the officers read Fox her *Miranda* rights. (Sciaroni Decl. ¶ 15.)

After Fox provided her laptop and cellphone to the CBP officers, they immediately gave them to HSI Agent Bondura. (Sciaroni Decl. ¶¶ 17, 24; Bondura Decl. ¶¶ 8-9.) After Fox was told she could not access these devices and that she would not get them back (that instead, they would be mailed to her), Fox asked that the officers retrieve important phone numbers for her and the officers did so. (Fox Decl. ¶ 14; Sciaroni Decl. ¶ 24.) CBP did not search the devices, nor did they search Fox's luggage or person. (Sciaroni Decl. ¶ 24; Fox. Decl. ¶ 6.) Bondura also did not search the devices after he was given them by CBP. (Bondura Decl. ¶ 9.) Instead, later that day, pursuant to HSI Agent's Shapiro's request, Bondura shipped the devices to Shapiro in New York. (*Id.* ¶¶ 8-10; Shapiro Decl. ¶¶ 12-14.)

Shapiro received the devices three days after they were seized, on November 16, 2021, and performed the manual search[6] of the cellphone that day. (Shapiro Decl. ¶ 14.) Twenty-four days after her phone and laptop were seized, on December 7, 2021, Fox reached out to Agent Shapiro to inquire about the status of her devices, which he still held. (*Id.* ¶ 15.) She also stated that the devices were important to her ability to work and to do her taxes.

---

were given voluntarily, instead adopting a passive voice and stating that the officer asked for the devices and "received" them. (*Id.* ¶ 17.) The Government does not argue that Fox handed over her devices voluntarily or that this impacts the Fourth Amendment analysis, focusing instead on the seizure's reasonableness under the border-search exception. (*See generally* Opp.) And there is no dispute that Fox sought to have her devices returned while at the airport.

[6] Manual searches "require an officer to manually traverse the contents of the traveler's electronic device, limiting in practice the quantity of information available during a basic search," and, unlike a forensic search do not "allow government officials to view deleted to encrypted files." *Alasaad v. Mayorkas*, 988 F.3d 8, 18-19 (1st Cir. 2021).

(*Id.*) Fox had reached out to HSI Agent Bondura about the status of her devices that same week. (Bondura Decl. ¶ 10.) On December 10, 2021, three days after Ms. Fox contacted Shapiro, and twenty-seven days after her devices were seized, the agent applied for a warrant to conduct a forensic search of the laptop and phone, seeking evidence of the fraud scheme. (Shapiro Decl. ¶ 16; *see also* Aff. in Support of Warrant.)

In the affidavit submitted in support of the warrant application, Shapiro stated that "[d]uring a screening by Customs and Border Protection . . . at the airport, Fox was found to possess" the phone and laptop. (Aff. in Support of Warrant ¶ 28.) He then stated that HSI "acquired custody" of the phone and laptop and shipped the devices to him in the Eastern District to "facilitate a manual review pursuant to the agency's border-search authority." (*Id.* ¶ 29.) The affidavit further stated that the manual review uncovered text and WhatsApp messages included as evidence in the affidavit. (*Id.* ¶¶ 30-31.) The messages were between Fox and other co-conspirators and were sent between March and July 2021. (*Id.* ¶¶ 32-42.) The messages indicate that Fox conspired with others to obtain approval of PPP loans based on fraudulent applications. (*Id.*) The affidavit also included information from a subpoena sent to a PPP lender which showed that Fox's company, Credit Benders, successfully filed PPP loan applications with the lender. (*Id.* ¶¶ 44-49.) And it included statements from Fox's December 7, 2021 call to Agent Shapiro when Fox asked about the status of her seized devices. (*Id.* ¶¶ 50-51.) According to Shapiro, this indicated that the devices were hers. (*Id.*) Shapiro also stated that individuals who prepare applications generally do so on laptop and desktop computers. (*Id.* ¶ 52.)

Shapiro summed up the evidence in support of a showing of probable cause to secure a warrant for a forensic search as follows:

Because Fox and her co-conspirators have filed PPP loan applications and successfully received [Economic Injury Disaster Loans]; because a manual review of the CELL-PHONES reveals numerous conversations about creating fraudulent loan applications (sometimes with applicant materials of "lists" of individuals affiliated with at least Parker), forging related financial records, and receiving fees for that misconduct; and because Fox's statements confirm that she uses both DEVICES to perform her business and make money, there is probable cause to conclude that information stored on the DEVICES will include evidence, fruits, and instrumentalities of the Subject Offenses. (*Id.* ¶ 53.)

The affidavit also stated that the devices "are in the lawful possession of HSI, incident to a lawful border search" and that they may have already had the authority to perform the forensic examination but that they were seeking a warrant "out of an abundance of caution to be certain that a forensic examination of the DEVICES complies with the Fourth Amendment and other applicable laws." (*Id.* ¶ 54.) In the affidavit, Shapiro also indicated knowledge of existing border search doctrine, including by citing to case law where courts distinguish between manual and forensic border searches and noting that the "Second Circuit has not opined on this issue." (*Id.* ¶ 29 n.1.)

The affidavit in support of the search warrant did not include certain details relating to the border search, including: that the investigation had been ongoing prior to Fox's arrival;[7] that Shapiro set up a notification to be alerted to Defendant Fox's

---

[7] There is no mention that the direction to investigate Fox was part of inquiries that began in July 2021 with an investigation opened in September 2021. (Shapiro Decl. ¶¶ 5, 11.)

travel the month before she re-entered the country;[8] that it was Shapiro who directed CBP to obtain the phone;[9] that the direction to seize the phone was made to assist with the investigation of financial fraud;[10] that no search of the phone actually occurred at MIA; and that Shapiro directed CBP to send the phone to New York so he could conduct the search.[11]

Magistrate Judge Robert M. Levy signed the warrant, allowing Shapiro to move forward with a forensic search of the phone and laptop. (Aff. in Support of Warrant at 23; Shapiro Decl. ¶ 16.)

Over a year later, on May 25, 2023, Defendants Jasmine Fox, Kariva Cross-McKnight, Maneka Duffy, Dominique Flynn, and Loren Parker Jr. were each charged with a single count of Wire Fraud Conspiracy pursuant to 18 U.S.C. §§ 1343, 1349. (*See generally* Indictment (Dkt. 1).) As alleged, Defendants recruited borrowers and helped them fill out fraudulent PPP loan applications in exchange for commissions. (*Id.* ¶ 11.) Defendants' scheme involved 120 loans on behalf of 90 applicants, with an estimated $3.5 million borrowed from the SBA and banks associated with the program. (*Id.* ¶ 20.) It is not alleged how much of this borrowed amount was transferred to Defendants in the form of commissions.

---

[8] Instead, the investigation timeline that Shapiro presents appears to begin on November 13, 2021, when Fox arrived at the airport and was "found to possess" the phone and laptop. (Aff. in Support of Warrant ¶ 28.)

[9] Shapiro just stated that the phone was retrieved "[d]uring a screening" by CBP officers. (Aff. In Support of Warrant ¶ 28.)

[10] Shapiro does state that in his role, he investigates "airport employees, including those suspected of illicit financial activities." (Aff. in Support of Warrant ¶ 4.) However, it is not apparent from the affidavit that the seizure of the phone was done pursuant to any of his investigative activities.

[11] Shapiro stated that after the screening, "HSI acquired custody" and shipped them to him to facilitate the manual search. (Aff. in Support of Warrant ¶ 29.)

## II.  LEGAL STANDARD

The Fourth Amendment enshrines "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing . . . reasonableness generally requires the obtaining of a judicial warrant." *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995).[12] This "ensures that the inferences to support a search are drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often-competitive enterprise of ferreting out crime." *Riley v. California*, 573 U.S. 373, 382 (2014). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.* The "ultimate touchstone of the Fourth Amendment is reasonableness[.]" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

On a motion to suppress evidence, once a defendant shows that the government officer acted without a warrant, "the government has the burden of showing that the search was valid because it fell within one of the exceptions to the warrant requirement." *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993); *see also United States v. Davis*, 111 F. Supp. 3d 323, 331 (E.D.N.Y.2015) ("Once the defendant has shown [that a government official acted without a warrant], the burden shifts to the government to demonstrate that the search or seizure did not violate the Fourth Amendment.").

If evidence was directly or indirectly obtained in violation of the Fourth Amendment, the court may forbid its use at trial under the exclusionary rule. *See United States v. Cacace*, 796 F.3d 176,

---

[12] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

188 (2d Cir. 2015). However, even if an officer obtained evidence in violation of the Fourth Amendment, the evidence will not be excluded "when the Government acts with an objectively reasonable good-faith belief that their conduct is lawful." *United States v. Zodhiates*, 901 F.3d 137, 143 (2d Cir. 2018). This good-faith exception covers "searches conducted in objectively reasonable reliance on appellate precedent existing at the time of the search," *id.,* as well as evidence obtained by "officers acting in objectively reasonable reliance on a warrant subsequently invalidated by a reviewing court," *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015).

The court now turns to Defendants' motion to suppress.

## III. DISCUSSION

Defendants raise several issues in their motions to suppress. This Memorandum and Order proceeds as follows: First, the court considers whether law enforcement violated Defendant Fox's Fourth Amendment rights. It then considers whether the good-faith exception to the exclusionary rule applies. Finally, it addresses the warrant that Agent Shapiro sought after the manual search.

To assess whether law enforcement violated Fox's Fourth Amendment rights, the court reviews the reasonableness of the search in light of: the application of the border-search exception; the privacy interests in cellphones at the border; whether the search was within the scope of what a search premised on reasonable suspicion would authorize; and whether the officers acted with unreasonable delay in seeking the warrant to conduct the forensic search. The court then considers whether the good faith exception to the exclusionary rule applies.

In doing so, the court finds that Agent Shapiro, when directing the seizure of Defendant Fox's phone and conducting the search

days later in New York, violated Defendant Fox's Fourth Amendment rights and acted with a reckless disregard for these rights. Further, the warrant issued by the magistrate judge for forensic examinations of the phone and laptop did not cure this defect. Agent Shapiro omitted critical details concerning the search, giving the impression that the phone was seized pursuant to a standard border search by CBP, displaying a conscious "disregard of the truth and [ ] heedless indifference to [Fox's] Fourth Amendment rights." *Raymonda*, 780 F.3d at 123 (Chin, J. concurring). He also acted with unreasonable delay in applying for the warrant under the principles the Second Circuit articulated the prior year in *United States v. Smith*. 967 F.3d 198, 213 (2d Cir. 2020).

The court ultimately finds that the value of deterring law enforcement officers' conduct relating to both the initial manual search and the later forensic search outweighs the high cost of excluding relevant evidence. Therefore, exclusion of evidence is warranted, and Defendant Fox's motion is GRANTED.

As to Defendants Flynn and Parker, however, the court finds that these defendants did not have a reasonable expectation of privacy in the messages on Fox's phone. *See U.S. v. Lifshitz*, 369 F.3d 173, 190 (2d Cir. 2004); *United States v. Lustyik*, 57 F. Supp. 3d 213, 223 (S.D.N.Y. 2014). Their motions are therefore DENIED.[13]

### A. Reasonableness and Exceptions to the Warrant Requirement

Under the Fourth Amendment:

＊

---

[13] Because Defendant Fox's suppression motion is granted on Fourth Amendment grounds, the court does not reach Fox's *Miranda* arguments.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S. Const. amend. IV.

"[T]he ultimate touchstone of the Fourth Amendment is reasonableness" and reasonableness generally requires a warrant when law enforcement officials undertake a search for evidence or criminal wrongdoing. *Riley v. California*, 573 U.S. 373, 381-82 (2014). There are exceptions, however, to this general warrant requirement. Some exceptions apply to broad categories of searches (e.g., searches incident to lawful arrests and border searches) while others apply to particular circumstances in a given investigation (e.g., exigencies of the situation, plain view). In defining whether an exception should be recognized, courts focus on the search's reasonableness and consider, on the one hand, "the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Miller*, 430 F.3d 93, 97 (2d Cir. 2005). The Supreme Court has cautioned against "untether[ing]" a given exception "from the justifications underlying it." *Collins v. Virginia*, 584 U.S. 586, 595 (2018).

## B. The Border-Search Exception to the Warrant Requirement

Agent Shapiro directed the seizure of Defendant Fox's phone and subsequently searched it without a warrant. A search of a suspect's phone for evidence of criminal wrongdoing generally requires a warrant, but the Government claims that a warrant was not required because the search fell under the border-search exception. (Opp. at 13-15.)

For the reasons discussed herein, the court disagrees. The search was entirely untethered from the purposes of this exception and fell outside of its authorized uses. And even if reasonable suspicion authorized the search of a cellphone at the border, the search here went beyond the scope of what the reasonable suspicion standard would authorize.

The court briefly reviews the law concerning the border-search exception, including its application to searches of cellphones at the border, before turning to the search at issue.

> 1.  The Border Search Exception to the Exclusionary Rule

The Supreme Court and this Circuit have long recognized "that the government has broad powers to conduct searches at the border even where . . . there is no reasonable suspicion that the prospective entrant has committed a crime." *Tabbaa v. Chertoff*, 509 F.3d 89, 97 (2d Cir. 2007). Searches made pursuant to the border-search exception are justified by "the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country" which makes such searches "reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). The exception thus draws on "the recognized right of the sovereign to control . . . who and what may enter the country," *id.* at 620, as well as the country's "inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004); *see also id.* at 153 ("The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border.").

But "[w]hat is the border, for purposes of a customs search, is not always a simple question." *United States v. Gaviria*, 805 F.2d 1108, 1112 (2d Cir. 1986). Searches at the airport clearly fall under the border-search exception. *Irving*, 452 F.3d at 124. The

border may also include "a reasonable extended geographic area in the immediate vicinity of any entry point." *Id.* (quoting *United States v. Nieves*, 609 F.2d 642, 647 (2d Cir. 1979)). A border search may become an "extended" border search if "conducted after a person or some property has cleared an initial customs checkpoint and has entered the United States." *Gaviria*, 805 F.2d at 1112. Such searches, given their "greater intrusion on legitimate expectations of privacy" are permitted only if supported by reasonable suspicion. *Id.*; *see also United States v. Glaziou*, 402 F.2d 8, 13 n.3 (2d Cir. 1968) (noting that the ability of officers to conduct warrantless search once an individual has left a border area is more limited than the ability to conduct a search at the actual border and that "[i]f this were not the case an individual would always be subject to search without probable cause no matter where he was in the United States and no matter how long he had been inside the United States if the search were conducted by the Bureau of Customs. Such a condition would be repugnant to the principles of the Fourth Amendment.")

"[T]he authority to make a valid extended border search depends upon such factors as the distance of the search from the point where goods could be introduced by the suspect into the United States, the time that has elapsed since the suspect had an opportunity to bring in the goods, and the circumstances upon which the officers base their suspicions." *Glaziou*, 402 F.2d at 13 n.3. Officers may also conduct a warrantless search of shipments of goods far from the initial point of entry, when the goods are transferred to another point of entry, even without reasonable suspicion, if certain conditions are met. Specifically, this may occur "only if: (1) [the final point of entry] is the intended final destination of the goods; (2) the goods, upon arrival, remain under a customs bond until a final search is undertaken by Customs; and (3) there is no evidence that anyone has tampered with the goods while in transit." *Glaviria,* 805 F.2d at 1114. In such cases, courts do not consider such border searches "extended" and

therefore allow such shipments to be searched absent reasonable suspicion. *Id.* at 1112, 1114.

When the border-search exception applies, there is a distinction between "routine" and "nonroutine" searches. Routine searches include: "searches of outer clothing, luggage, a purse, wallet, pockets, or shoes." *United States v. Irving,* 452 F.3d 110, 123 (2d Cir. 2006). Routine searches that properly fall under this exception do not require a warrant or even reasonable suspicion to be reasonable under the Fourth Amendment. *United States v. Montoya de Hernandez,* 473 U.S. 531, 538 (1985). Nonroutine border searches, however, require weighing the "offensiveness of the intrusion" against "the level of warranted suspicion." *Irving,* 452 F.3d at 123; *see also Flores-Montano,* 541 U.S. at 152. Such searches generally require at least reasonable suspicion and include invasive searches such as strip searches or alimentary canal searches. *Irving,* 452 F.3d at 123. This may also include searches of personal items in which an individual has a heightened privacy interest. *See United States v. Levy,* 803 F.3d 120, 123 (2d Cir. 2015) (considering whether copying a notebook required reasonable suspicion but finding it unnecessary to resolve this issue). [14] The Second Circuit has not determined whether searches of cellphones following the Supreme Court's 2014 ruling in *Riley* are routine or nonroutine, as reviewed in more detail *infra.*

---

[14] Though it did not resolve whether copying a notebook was routine or nonroutine, the Circuit suggested in dicta that this would not require reasonable suspicion because such a level of suspicion is generally reserved for intrusive searches of the person such as body-cavity searches or strip searches. *Id.* Similarly, in *United States v. Irving,* the Circuit applied the reasonable suspicion standard without finding it was required when finding a search by CBP officers of computer disks and undeveloped films to be reasonable. 452 F.3d 110, 124 (2d Cir. 2006). Because reasonable suspicion was met in both cases, the Circuit did not need to determine whether the search was routine or non-routine. *Id.*

Finally, the border-search exception may apply even if the search "is prompted by a criminal investigative motive," *Irving*, 452 F.3d at 123, or if the investigation conducted by border officials is prompted by a separate federal agency. *Levy*, 803 F.3d at 124. The Second Circuit, in a case involving CBP's search of luggage and a notebook belonging to an individual returning to the United States to face charges, held that the CBP has the "authority to search and review a traveler's documents and other items at the border when they reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties." *Id.* at 121-24. Whether the CBP officer's "reasonable suspicion arises entirely from her own investigation or is prompted by another federal agency is irrelevant to the validity of a border search." *Id.* at 123.

The border-search exception is thus broad, but what is reasonable at the border still requires a consideration of the balance between an individual's Fourth Amendment interests and the Government's interests. *Montoya*, 473 U.S. at 537; *see also United States v. Smith*, 673 F. Supp. 3d 381, 391 (S.D.N.Y. 2023) ("What differs at the border is the standard of reasonableness, which plays out in a qualitatively different way at the international border versus the interior.") (citing *Montoya*, 473 U.S. at 537).

### 2. Privacy Interests in Cellphones

A decade ago, in *Riley v. California*, the Supreme Court recognized the substantial privacy interests individuals have in cellphones when declining to extend the search incident to a lawful arrest exception to these devices. *Riley*, 573 U.S. at 392-98. The Court discussed at length how the privacy concerns implicated by cellphones extend "far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Id.* at 392-93. The court also reviewed the government's interests justifying the search incident to lawful arrest exception, specifically harm to officers and destruction of evidence. *Id.* at 387-90. In considering

these and governmental interests, the Court held that officers must obtain a warrant to search a cellphone, even if recovered during a search incident to a lawful arrest. *Id.* at 403.

Neither the Second Circuit nor the Supreme Court has directly applied *Riley* to manual searches of cellphones seized pursuant to the border-search exception. District courts in the Circuit reviewing the issue have generally agreed that the search of a cellphone requires at least reasonable suspicion of either evidence of criminal activity or evidence of digital contraband. *See, e.g., United States v. Smith*, 673 F. Supp. 3d 381, 396 (S.D.N.Y. May 11, 2023) (discussing at length the heightened privacy interests in cell phones and reduced government interests due to the nature of digital data and finding that officers violated the defendant's Fourth Amendment rights where the search of a cellphone was not for digital contraband nor evidence of digital contraband);[15] *United States v. Alisigwe*, 2023 WL 8275923, at *5 (S.D.N.Y. Nov. 30, 2023) ("[C]ellphone searches cannot be conducted without reasonable suspicion of criminal activity because they are not routine border searches."); *United States v. Gavino*, No. 22-CR-136 (RPK), 2024 WL 85072, at *4-5 (E.D.N.Y. January 7, 2024) ("[R]easonable suspicion of criminal activity suffices to justify a cell-phone border search.").[16]

---

[15] The court stated that its "preferred rule" would require a warrant for all phone searches at the border. *Id.*

[16] Notably, even in those cases finding reasonable suspicion of criminal activity sufficient to conduct a border search of a cellphone, the suspected crime was connected to the Government's interest in protecting its territorial integrity. For example, in *Alisigwe*, the defendant was searched because he was suspected of using fraudulent passports—relating to the Government's interest in border integrity and knowing who is entering the country. *Alisigwe*, 2023 WL 8275923, at *5. Similarly, in *Gavino*, the law enforcement officer that searched the defendant's phone had reasonable suspicion to believe that the defendant was engaged in narcotics trafficking—relating to the Government's interest in preventing contraband from

Circuit courts have differed on what standard law enforcement is required to demonstrate for a border-search of cellphones to be permissible under the Fourth Amendment. The Ninth Circuit, for instance, allows a warrantless manual search only to "determine whether the phone contains contraband," and a forensic search only if there is reasonable suspicion of contraband. *United States v. Cano*, 934 F.3d 1002, 1018-1021 (9th Cir. 2019) ("[B]order officials are limited to searching for contraband only; they may not search in a manner untethered to the search for contraband.").[17] Circuits have also considered the crime at issue and whether it implicates border interests. *See, e.g., United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) (considering whether the search was for evidence of a crime with a "transnational component"); *United States v. Xiang*, 67 F.4th 895, 901-02 (8th Cir. 2023) (declining to find a Fourth Amendment violation when there was reasonable suspicion by CBP of evidence of defendant's engagement in economic espionage for a Chinese company); *Alasaad v. Mayorkas*, 988 F.3d 8, 21 (1st Cir. 2021) (finding that the border-search exception allows searches for "evidence of either contraband or a cross-border crime" and that advanced searches may be used to "search for contraband, evidence of contraband, or for evidence of activity in violation of the laws enforced or administered by CBP or ICE."). The Fourth Circuit has indicated a holistic analysis is necessary to determine whether a search a cell phone falls under the border-search exception. *United States v. Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2018), *as amended* (May 18, 2018) ("At some point . . . even a search initiated at the border could become so attenuated from

---

the country. *Gavino*, 2024 WL 85072 at *4-6. The court is unaware of a district court in this Circuit considering the application of the border-search exception to the search of a cellphone when law enforcement sought evidence of a domestic crime.

[17] In the context of a cell phone, contraband is "digital contraband" such as child pornography. *Id.* at 1019.

the rationale for the border search exception that it no longer would fall under that exception.")[18] And the Eleventh Circuit has rejected that a search of a phone at the border required even reasonable suspicion. *United States v. Touset*, 890 F.3d 1227, 1231 (11th Cir. 2018) ("[T]he Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border.") (emphasis added). Notably, however, the Eleventh Circuit articulated this broad rule in cases focusing on reasonable suspicion of contraband in the form of child pornography, which other Circuits agree would allow some form of warrantless search because it constitutes "contraband" rather than evidence of a crime. *Id.* at 1231, 1238 ("After all, our nation has classified child pornography as contraband for good reason."); *accord Cano*, 934 F.3d at 1020-21 (reviewing child pornography as contraband).

Reviewing whether cellphones properly fall under this exception has prompted courts to consider the historical foundations and justifications of the border-search exception. On this point, the court finds a concurrence from then-Judge Costa in the Fifth Circuit illuminating. *See United States v. Molina-Isidoro*, 884 F.3d 287, 293-97 (5th Cir. 2018) (Costa, J., concurring). As reviewed by Judge Costa, to support the foundations of this exception, the Supreme Court has pointed to a statute passed in 1789 by the same Congress that proposed the Bill of Rights. *Id.* at 295 (collecting cases). The statute "granted customs officials 'full power and authority' to enter and search 'any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed . . .'" *Id.* (quoting Act of July 31, 1789, c. 5, 1 Stat. 29. Section 24). The statute thus allowed customs officials to search for and seize "goods, wares and

---

[18] The nexus existed in that case in part due to the "transnational offense" of which the defendant was suspected. *Id.*

merchandises" but it "did not provide that authority to obtain evidence of crimes other than the contraband itself." *Id.* at 295 (Costa, J., concurring) (citing Act of July 31, 1789, 1 Stat. 29); *cf. Touset*, 890 F.3d at 1232 (in which the Eleventh Circuit cited this statute for a more general proposition that it supports the sovereign's interest in protecting "territorial integrity.") Further, "every border-search case the Supreme Court has decided involved searches to locate items being smuggled into the country" as opposed to evidence of crimes. *Molina-Isidoro*, 884 F.3d at 295 (Costa, J., concurring) (collecting cases). It then follows that the border-search exception's justification has a significant link to contraband and there is not a tradition for "unlimited authority to search and seize items that might help to prove border crimes but are not themselves instrumentalities of the crime." *Id.* at 297.

The court finds the background on the border-search exception, and various courts' insights on this issue, helpful before turning to the case before the court. For clarity, however, the court notes that while the contours of the exception continue to be debated, there are instances such as this where an officer claiming an exception clearly operates outside of what is permissible under the Fourth Amendment.

### 3.  Application

In the month before Defendant Fox's phone was seized at the border, HSI Agent Shapiro set up a means to be notified of her travel for the apparent purpose of searching the phone without a warrant over one thousand miles[19] away and days after the seizure. (Shapiro Decl. ¶ 11.) His impetus for directing the seizure was his suspicion that she was involved in a domestic financial crime, relating to an investigation he opened in July 2021 concerning fraudulent Paycheck Protection Program applications.

---

[19] *See Distance Calculator*, https://www.distance.to/Miami/New-York (last visited July 24, 2024).

The Government argues this is a valid application of the border-search exception.

The court disagrees and finds that the search and seizure of Defendant Fox's phone was not a border search and therefore violated her Fourth Amendment rights. Allowing otherwise would stretch the border-search exception far beyond its justifications.

Apart from the seizure of Fox's phone taking place at the airport upon her return from an international trip, there is no reasoned justification that the search would fall under the border-search exception. Agent Shapiro became interested in seizing the phone in the month prior to Defendant Fox's trip while she was located in the United States; the search was conducted over one thousand miles from where Fox entered the country; the phone was not searched until days later; the relevant officers were not searching for contraband or evidence of contraband; the interest in the phone derived from a domestic crime without a transnational connection and which was unrelated to CBP's enforcement of border laws; CBP did not conduct the search, nor did CBP have any independent justification for conducting a search; there is no indication that Fox engaged in illegal activities abroad or during her travels; there is no indication the search was prompted by an interest in excluding unwanted persons from the country;[20] and even after the phone's search, the evidence from the search was not used to apply for a warrant until weeks later with no apparent justification for the delay.

---

[20] *See United States v. Ramsey*, 431 U.S. 606, 616 (1977) (noting that the "border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, *who* and what may enter the country") (emphasis added).

Thus, the justifications for the border-search exception—border integrity, stopping contraband or individuals from entering the country, exigency, national security—are not present.

The Government raises several arguments for why the border-search exception should nevertheless apply. argues that the border-search exception applies because one's expectation of privacy is reduced at the border. But just because one "has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely." *Riley*, 573 U.S. at 392. And it is hard to imagine how the Supreme Court could have been clearer that an individual has heightened privacy interests in cellphones even when a traditional exception otherwise applies. *Id.* at 393 (noting that the government's argument that searching physical items like a wallet or address book is "materially indistinguishable" from searching a cellphone "is like saying a ride on horseback is materially indistinguishable from a flight to the moon."). The implication of the Government's broad view of the border-search exception is that the cellphone of any individual arriving home from a trip abroad is subject to search without even reasonable suspicion. (Opp. at 13.) But one does not forfeit his or her privacy rights in a device that keeps a digital record of nearly every aspect of one's life whenever they cross the border after a vacation or business trip. *See Riley*, 573 U.S. at 395 ("Today . . . it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate."). Accordingly, Agent Shapiro was not permitted to shirk the warrant requirement that would otherwise apply to searches of cellphones for evidence of a domestic crime by directing the seizure of the phone at the airport.

The Government also notes a concern about the burden on CBP officers charged with protecting the border if there was a

greater standard for searches of phones to be reasonable. (Opp. at 14 ("Because of 'the volume of travelers passing through our nation's borders, warrantless electronic device searches are essential to the border search exception's purpose of ensuring that the executive branch can adequately protect the border.'") (quoting *Alasaad*, 988 F.3d at 17.) But this too is disconnected from the facts of this case. Fox was flagged by an HSI Agent investigating domestic financial fraud in the months prior to her travel and directed CBP to seize the phone in aid of a domestic investigation concerning PPP fraud. Any burden imposed on CBP would be a result of Agent Shapiro directing them to aid in his domestic fraud investigation. While his ability to obtain the phone without a warrant surely aided his investigation, it is unclear how requiring him to a valid warrant for his search would compromise CBP's ability to protect the integrity of our borders.

The Government also argues that the search at issue was not an extended border search despite the search occurring over one thousand miles from where the item was seized, in part by citing *Gaviria's* statement that "the shipment had not yet been cleared by customs in Miami." (Opp. at 15 (citing *United States v. Gaviria*, 805 F.2d 1108, 1112 (2d Cir. 1986)).)[21] But the type of border search described in *Gaviria* is inapplicable to the facts here. In *Gaviria*, the relevant property searched by CBP was 70 cartons of canned fruit that arrived from Medellín, Colombia. Even though the shipment arrived in Miami and traveled to New York via truck, customs officials in New York were still permitted to conduct a border search with reasonable suspicion because three conditions were satisfied: (1) New York was the intended final destination of the goods, (2) the goods remained under a customs bonds while in transit, and (3) there was no evidence that

---

[21] The Government substitutes the word "shipment" with "property" in its briefing, (Opp. at 15), but the court finds the distinction significant to the Second Circuit's analysis for the reasons discussed in this paragraph.

the goods had been tampered with. *Id.* at 1114.[22] Given the Government's legitimate interests in inspecting goods upon their arrival at the border[23] and preventing contraband from entering the country, the search of shipments of goods remains reasonable if these three conditions were met. *Id.*

Given the context of *Gaviria* and its focus on shipments of goods, it is not immediately clear how the case applies, if at all, to seized personal items and the facts here. The intended destination of a personal item is with the person, not to any particular location. It was certainly not the case that Fox intended the phone to be shipped to Agent Shapiro so the first requirement under *Gaviria* is not met. And there was no customs bond because Fox was not importing any merchandise so the second requirement under *Gaviria* is not met. The Government's citation to *Gaviria* for the proposition that the phone here was subject to search because it did not clear customs, (Opp. at 15), is thus unavailing. A case involving the inspection of untampered fruit that was being used to smuggle cocaine from Colombia—the "zenith" of the Government's interest in ensuring the integrity of the border, even though it occurred after the fruit transited 1,500 miles—does not permit the search of personal items over one thousand miles away for domestic investigations wholly unrelated to the Government's border interests.

---

[22] "[W]hen goods physically enter the United States at one port, and are subsequently transferred to another port of entry, then the final port of entry will be considered the functional equivalent of the border for the purposes of a customs search, only if: (1) it is the intended final destination of the goods; (2) the goods, upon arrival, remain under a customs bond until a final search is undertaken by Customs; and (3) there is no evidence that anyone has tampered with the goods while in transit." *Id.* at 1112.

[23] Border includes airport searches and the search includes both an initial search as well as secondary searches that extend to "a reasonable extended geographic area in the immediate vicinity of any entry point." *Irving*, 452 F.3d at 124 (citing *Nieves*, 609 F.2d at 647).

More generally, the Government focuses its opposition to Defendant Fox's motion on the Government's "broad plenary powers" to conduct searches at the border. (Opp. at 6.) As discussed *supra*, the Circuit has indeed held that the Government's authority to conduct searches at the border is broad. Most relevant here is this Circuit's ruling in *United States v. Levy* allowing CBP to search and seize items as part of investigations into criminal activity even if instigated by other agencies. In *Levy*, cited by the Government, a defendant's notebook was searched when he arrived in the United States "to face criminal charges that he expected would be leveled against him." *United States v. Levy*, 803 F.3d 120, 121 (2d Cir. 2015).[24] Upon Levy's arrival, CBP searched and photocopied a notebook alongside other luggage at the direction of the Drug Enforcement Administration, the agency responsible for conducting the federal investigation. *Id.* The Circuit upheld the district court's denial of the motion to suppress and stated that it was irrelevant to the border search question whether the CBP officer's suspicion arose from their own investigation or was prompted by a separate agency. *Id.* at 123.

*Levy* thus creates binding precedent that CBP may conduct a standard border search at the border, even when directed to do so by a separate agency, when an individual returns from abroad to face pending criminal charges. *Levy* does not, however, provide blanket permission for law enforcement to direct CBP to seize smartphones pursuant to an early-stage investigation of domestic crime. The Circuit did not analyze several of the circumstances relevant here, including: the impact of an officer establishing a record to be notified of an individual's travel for the apparent purpose of employing the border-search exception;

---

[24] The criminal charges were for domestic fraud and money laundering charges and the expectation that he would be charged was due to the defendant's prior contact (through his lawyers) with prosecutors. *Id.*

whether it is relevant that CBP did not actually conduct the search; whether it was relevant that the search was not conducted at the airport of entry; whether the officer directing the seizure provided additional information to CBP to support that there was reasonable suspicion of the criminal activity; whether the defendant's knowledge of the impending criminal charges provided greater justification for the search due to a reduced expectation of privacy; and whether the heightened privacy interest in cellphones requires a greater level of suspicion of criminal activity to be reasonable.[25] And it is easy to distinguish a case in which CBP was permitted to search a single notebook in a person's luggage upon arrival to the United States, and the case here, in which CBP seized Fox's phone—the functional equivalent of all of her notebooks—to send to a separate agency to conduct a search days later far from the border.

Thus, the search at issue falls outside of the border-search exception. The court does not attempt to establish a framework for when manual searches of cell phones seized at the border are reasonable, as other courts have done. In a case with different facts—where the individual was not targeted in the month prior to her flight, where the search was conducted by CBP, where the search occurred near in location or time to the seizure, where the search was for contraband, where the search related to a cross-border crime, or where the search was of a personal item other than a cell phone—the court may find such a search reasonable. But in considering the facts here, the search was not covered by the border search exception and required a warrant. The search therefore violated Defendant Fox's Fourth Amendment rights.

---

[25] Further, the Circuit declined to reach the question of whether photocopying the notebook converted the search from routine to nonroutine such that it would require reasonable suspicion because this standard was met. *Levy*, 803 F.3d at 123.

### C.  Reasonable Suspicion

Because the court finds that the search at issue does not fall under the border-search exception, reasonable suspicion would be insufficient to allow the search here. For completeness, however, the court reviews why, even if reasonable suspicion authorized a search of Defendant Fox's phone under the border-search exception, the search was still unreasonable because it was outside the scope of what this standard would authorize.

As discussed *supra*, for a search of cellphones at the border to be reasonable under the Fourth Amendment, district courts in the Second Circuit and other Circuit Courts since *Riley* have generally required reasonable suspicion of either: contraband; evidence of contraband; or, at minimum, evidence of criminal activities. Reasonable suspicion is also the standard for officers conducting non-routine border searches such as strip searches, *see Irving*, 452 F.3d at 123, or "extended" border searches. *See United States v. Glaziou*, 402 F.2d 8, 14 (2d Cir. 1968). The court agrees that reasonable suspicion of *at least* criminal activity, if not contraband, is required to search a cellphone under the border-search exception given the heightened privacy interests in these devices and the lack of reasoned justification that the exception should apply to warrantless searches of cellphones. The court therefore considers this standard and applies them to the search at issue here.

"The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014); *see also United States v. Levy*, 803 F.3d 120, 123 (2d Cir. 2015) (applying the standard reviewed in *Navarette* to a border search conducted by CBP). "Although a mere hunch does not create reasonable suspicion . . . the level of suspicion the standard requires is considerably less than proof of wrongdoing by a

preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397; *see also Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."); *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985) (holding that this standard "fits well into the situations involving alimentary canal smuggling at the border: this type of smuggling gives no external signs and inspectors will rarely possess probable cause to arrest or search, yet governmental interests in stopping smuggling at the border are high indeed."). While this is a lower standard than probable cause, the level of suspicion must still be supported by "specific and articulable facts" that "taken together with rational inferences" provides officers with an objective basis for suspecting wrongdoing. *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016); *see also Kansas v Glover*, 589 U.S. 376, 385 (2020) (noting the ability of officers to meet the reasonable suspicion standard with facts and "commonsense judgments").

The Second Circuit has reviewed several factors to determine whether reasonable suspicion supports an intrusion in the context of non-routine border searches, including the "unusual conduct of the defendant, discovery of incriminating matter during routine searches, computerized information showing propensity to commit relevant crimes, or a suspicious itinerary." *United States v. Irving*, 452 F.3d 110, 124 (2d Cir. 2006). In *Irving*, the Circuit applied these factors to uphold the reasonableness of a CBP officer's border-search of computer disks

and undeveloped films by CBP. *Id.*[26] The officers suspected that these objects had child pornography on them based on several "specific and articulable facts," including that: "Irving was a convicted pedophile; he was the subject of criminal investigation; he had been to Mexico; he claimed that he visited an orphanage while in Mexico; and his luggage contained children's books and drawings that appeared to be drawn by children." *Id.* at 115, 124.

Even when there is reasonable suspicion of criminal activity, however, the resulting intrusion must still be "reasonably related in scope to the circumstances which justified it initially." *Montoya*, 473 U.S. at 542; *see also United States v. Compton*, 830 F.3d 55, 64 (2d Cir. 2016) ("[T]he detention can continue only for the period of time necessary to either verify or dispel the suspicion."); *United States v. Bailey*, 743 F.3d 322, 342 (2d Cir. 2014) (finding that handcuffing the suspect took the brief detention outside the scope of a reasonable *Terry* stop because it was unnecessary once the suspect was found to be unarmed).

"In assessing whether a detention is too long or intrusive to be justified as an investigative stop, courts properly 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Bailey*, 743 F.3d at 336 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). But in applying this standard, courts are cautioned that:

> A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive

---

[26] The Circuit did not determine whether reasonable suspicion was in fact required; it just noted that because it was met, the Circuit did not need to determine whether the search was routine or non-routine. *Id.*

means does not, itself, render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it. *Id.* (citing *Sharpe*, 470 U.S. at 686–87); *see also Montoya*, 473 U.S. at 542 (citing *Sharpe* in applying this standard to reasonable suspicion in the border-search context when considering reasonable suspicion of alimentary canal smuggling).

Under "the principles of *Terry* and its progeny," the Supreme Court has held that the brief investigatory detention of luggage at the airport is reasonable upon a finding of reasonable suspicion of drug trafficking, "provided that the investigative detention is properly limited in scope." *United States v. Place*, 462 U.S. 696, 706 (1983).[27] Applying this standard and considering the scope of the search permitted by an officer's reasonable suspicion, the Supreme Court in *United States v. Place* held that a 90-minute seizure of luggage "alone preclude[d] the conclusion that the seizure was reasonable in the absence of probable cause." *Id.* at 709. In doing so, the Court noted the agents' awareness of the defendant's impending arrival at the airport which afforded them "ample time to arrange for [the suspect's] additional investigation at that location" which could have allowed the agents to "minimize[] the intrusion on [the suspect's] Fourth Amendment interests." *Id.* at 709-10. Thus, "the detention of respondent's luggage . . . went beyond the narrow authority possessed by police to detain briefly luggage reasonably suspected to contain narcotics." *Id.* at 710.

By contrast, in *Montoya*, the Court held that even an otherwise extreme sixteen hour detention of an individual suspected of

---

[27] Note that this case did not concern the border-search exception. The reasonable suspicion was aroused by a sniff-test from a dog trained to detect narcotics for an individual flying domestically, from MIA to LGA. *Id.* at 697-700.

smuggling contraband in her alimentary canal was reasonable because it was tailored to the specific circumstances: the defendant had refused a less-intrusive alternative (to submit to an x-ray), and the only practical manner for law enforcement to confirm or allay their suspicions was to wait for the defendant to produce a bowel movement. 473 U.S. at 542-43. The sixteen-hour detention was thus reasonable because its was related to the circumstances which justified it. *Id.* at 543.

Applying the reasonable suspicion analysis to the facts of this case, law enforcement had reasonable suspicion that Fox had engaged in past criminal activity, but their resulting search and seizure of Fox's phone was outside the scope of what reasonable suspicion would authorize. At the time that Shapiro directed CBP to seize the Defendant's electronic devices, he had learned that Fox had applied for and received "one PPP loan" for an entity known as The Reveal Collection—a business that "was incorporated in 2018, dissolved in 2019, and reinstated in 2020 shortly before filing at least one PPP loan application." (Shapiro Decl. ¶ 7.) Based on his "training and experience," Shapiro recognized that pattern as being "consistent with using a shell company to fraudulently receive business loans, such as PPP loans." (*Id.*) Shapiro also had information that an individual "who is not a charged defendant in this case had received multiple peer-to-peer fund transfers" from LGA employees and related entities who were recipients of PPP loans—at times roughly coinciding with "those employees and entities receiv[ing] the PPP loan proceeds." (*Id.* ¶ 9.) Shapiro also knew that this same uncharged individual had been transferring money to Ms. Fox's husband and a different business associated with Ms. Fox, Credit Benders. (*Id.* ¶ 10; Def.'s Reply at 3.) This led Shapiro to suspect "that Mr. Parker and Ms. Fox were part of a PPP fraud and money laundering scheme." (Shapiro Decl. ¶ 10.) These facts provide reasonable suspicion that Fox had engaged in PPP fraud. *See United States v.*

*Weaver,* 9 F.4th 129, 140 (2d Cir. 2021) (noting that the "reasonable suspicion standard is not high").

However, the search was overly intrusive and outside the scope of a search that would be authorized by reasonable suspicion of prior criminal activity, making it unreasonable under the Fourth Amendment.[28] Agent Shapiro developed his suspicions that Fox had committed PPP fraud a month prior to the search and directed the seizure of a cellphone in the weeks before it was taken, once receiving a notification that Fox would arrive at MIA from an international trip. The phone was then sent, pursuant to Shapiro's direction, from Miami to New York to be searched three days later. The phone was then retained and the contents were used to apply for a warrant approximately four weeks later.

---

[28] The scope of the type of search that reasonable suspicion of past criminal activity *would* authorize is uncertain and this analysis has some overlap with the court's analysis when finding that the search does not fall under the border-search exception. Reasonable suspicion developed to allow for brief investigatory stops to determine whether criminal activity is "afoot" when officers suspect that the person subject to the stop "may be armed and dangerous." *See Terry v. Ohio,* 392 U.S. 1, 30 (1968); *see also Bailey,* 743 F.3d at 332. Courts have, however, found ongoing criminal activity to be sufficient without focusing on the potential that the suspect is armed. *See United States v. Manuel,* 647 F. App'x 11, 12 (2d Cir. 2016) (Summary Order) (affirming a finding reasonable suspicion to stop a livery cab based on the passenger appearing to be intoxicated in the back seat). In border cases, suspicion of smuggling or transporting contraband would clearly qualify as engaging in ongoing criminal activity such that reasonable suspicion may authorize an investigatory stop. *See Montoya,* 473 U.S. at 542 (search of contraband in the form of cocaine); *Irving,* 452 F.3d 124 (search of suspected contraband in the form of child pornography). And the Circuit has allowed the brief inspection and scanning of a notebook based on a suspicions that it may contain evidence of prior criminal activity. *Levy,* 803 F.3d at 123. But it is unclear if more than a brief stop to review a suspect's personal items may be justified when one has reasonable suspicion that an individual engaged in *prior* criminal activity when they are not currently engaging in such activity or posing a danger. Here, however, for the reasons discussed, the scope was clearly outside the bounds of what reasonable suspicion would authorize.

There is no argument that Defendant Fox was currently engaged in criminal activity[29] or that she posed a danger, either when Agent Shapiro established a notification to be alerted to her travel or when she arrived from her vacation at MIA. *Cf. Terry*, 392 U.S. at 30 (allowing a brief investigatory stop based on reasonable suspicion when "criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous"). The search was thus wholly unlike patting an individual down for weapons during a *Terry* stop, stopping an individual at the airport to review, copy, and return his notebook, *Levy*, 803 F.3d at 123, reviewing a suspect's film for evidence of child pornography, *Irving*, 452 F.3d at 124, or detaining an individual to conduct an alimentary canal search, *Montoya*, 473 U.S. at 542. The weeks-long seizure was also significantly more intrusive than the 90-minute detention of luggage found unreasonable in *Place*. 462 U.S. at 710 ("[T]he detention of respondent's luggage in this case went beyond the narrow authority possessed by police to detain briefly luggage reasonably suspected to contain narcotics."). And unlike the search in *Montoya*, the seizure of Fox's phone was not necessary to prevent imminent unlawful activity from occurring or a result of her refusal of a less intrusive search. 473 U.S. at 542-43.

It does not take a very "creative judge" to "imagine some alternative means by which the objectives of the police might have been accomplished." *Bailey*, 743 F.3d at 340; *Montoya*, 473 U.S. at 542. Even if reasonable suspicion of criminal activity was sufficient to search Defendant Fox's phone, a manual scan at MIA would clearly be a "less intrusive means" to "protect the public,"

---

[29] The PPP program stopped accepting applications in May 2021. *See* SBA OIG, 22-13, *SBA's Handling of Potentially Fraudulent Paycheck Protection Program Loans*, at 1 (May 26, 2022).

*Bailey*, 743 F.3d at 340, than sending the phone over one thousand miles[30] north to this district to review Defendant Fox's text and WhatsApp messages. This is especially the case because, for reasons unclear to the court it took three days for the phone to arrive in New York and the phone was kept for weeks until Agent Shapiro applied for a search warrant. The Government has not provided any persuasive reason as to why Shapiro had to conduct the search in New York, noting only that Shapiro and HSI Agent Bondura agreed that the phone would be sent to him because Shapiro had superior knowledge of the ongoing fraud investigation. (Opp. at 2.) But in the weeks that Shapiro had to plan the seizure before Defendant Fox's arrival at the airport, Shapiro surely could have told Bondura about the investigation or flown to Miami himself to minimize the intrusion on Fox's Fourth Amendment rights.[31] *See Place*, 462 U.S. at 709 (finding 90-minute seizure of luggage unreasonable in part due to the "ample time" the agents had in arranging for an investigation at the airport which could have minimized the intrusion on the defendant's Fourth Amendment interests).

Because the search as it occurred was far more intrusive than required to confirm the Government's reasonable suspicion, it fell

---

[30] See Distance Calculator, https://www.distance.to/Miami/New-York (last visited July 24, 2024).

[31] Because the court relied on the scope of reasonable suspicion as it relates to the seizure and delayed search, the court does not consider the Defense's alternative argument that reasonable suspicion did not support the search because such evidence that would have supported the suspected criminal activity would not be on the phone (as opposed to a laptop) or in Defendant Fox's messages. (*See* Reply at 7; Oral Argument Tr. at 27:23-29-1.)

outside the scope of a brief investigatory stop that reasonable suspicion would authorize and therefore violated Defendant Fox's Fourth Amendment rights.[32]

For clarity, a warrant was required to search Fox's phone because the border-search exception does not apply. *See supra*. But if applying the reasonable suspicion standard, this was not met because the search fell outside of the scope what this standard would authorize.

### D.  Unreasonable Delay in Search of Phone

The subsequent forensic search of the cellphone and laptop search were unreasonable due to Shapiro's delayed application for the warrant after the phone was in his possession.

"The right of the police to temporarily seize a person's property pending the issuance of a search warrant presupposes that the police will act with diligence to apply for the warrant." *United*

---

[32] The unreasonableness of the search is also supported by the lack of support for the search in Fox's encounters with CBP officers at MIA. *Cf. Terry*, 392 U.S. at 30 (noting that the limited search authorized by *Terry* is reasonable only if the officer identifies himself and nothing in the initial stages of the encounter dispel their reasonable fear for the officer's safety); *Irving*, 452 F.3d at 124 (authorizing border search for child pornography contraband based on reasonable suspicion supported in part by claim that suspected visited an orphanage in Mexico and that a search of luggage included children's books). In her interactions with CBP officers, "Ms. Fox did not act evasively or suspiciously." (Opp. at 4; Sciaroni Decl. ¶ 21; Def.'s Reply at 2.) Her demeanor was instead described as "polite," "professional," and "cooperative." (Opp. at 4; Sciaroni Decl. ¶ 21; Reply at 2.) *Cf. United States v. Gavino*, No. 22-CR-136 (RPK), 2024 WL 85072, at *6 (E.D.N.Y. Jan. 7, 2024) (noting that when questioned at the border, the defendant acted nervous, lied about her travel, and answered in ways that didn't make any sense). And CBP officers never asked to search Ms. Fox's luggage or carry-on bag in her possession, nor did they ask Ms. Fox to empty her pockets. (Fox Decl. ¶ 6.) *Cf. Irving*, 452 F.3d at 124 (noting that luggage search revealed additional evidence supporting suspicions).

*States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020). Law enforcement must therefore act with "expediency in obtaining a search warrant to search seized evidence in order to avoid interfering with a continuing possessory interest for longer than reasonably necessary." *Id.* "[U]nnecessary delays . . . undermine the criminal justice process" by "prevent[ing] the judiciary from promptly evaluating and correcting improper seizures." *Id.* "[T]he general press of police business may not justify a lengthy delay absent particular evidence showing why other police duties reasonably took precedence." *Id.* at 213. When articulating this rule in 2020, the Second Circuit noted these principles shall "inform the application of the exclusionary rule in future cases." *Id.*

Courts consider four factors when considering whether the delay makes a seizure unreasonable: "[1] the length of the delay, [2] the importance of the seized property to the defendant, [3] whether the defendant had a reduced property interest in the seized item, and [4] the strength of the state's justification for the delay." *Id.* at 206. In considering these factors, the court finds that each weighs in favor of a Fourth Amendment violation.

As to the first factor, length of the delay, the Second Circuit has held that eleven days "might well constitute an unreasonable delay" depending on the circumstances, and that a one-month delay "well exceeds what is ordinarily reasonable." *Id.* at 206. The phone was seized on November 13, 2021, sent to Shapiro that day, and arrived in New York on November 16, 2021. Its contents were used to apply for the warrant on December 10, 2021, twenty-seven days[33] from the initial seizure. As in *Smith*,

---

[33] The court considers the seizure at MIA more relevant as the starting point than the date when Shapiro received the phone given the focus on one's property interests in *Smith*. *Id.* at 205 ("A 'seizure' of personal property occurs for purposes of the Fourth Amendment if the police meaningfully interfere with an individual's possessory interests in that property.")

this extended delay without justification exceeds what is normally reasonable. Therefore, this factor weighs strongly in favor of suppression.

As to the second factor, the importance of the property at issue, the Circuit has "recognized the special concerns that apply when law enforcement seize and search people's personal electronic data and communication devices." *Smith*, 967 F.3d at 207-08 (citing *Riley v. California*, 573 U.S. 373, 134 (2014)). This heightened privacy interest exists even when the phones were seized under "exceptions to the Fourth Amendment's warrant requirement." *Id.* at 208. This interest is therefore high given the seizure related to a phone and laptop. Further, when calling Shapiro to ask about the status of her phones, Fox also noted that her devices were important for her personal and business use. (Shapiro Decl. ¶ 15.) And Fox was actually deprived of her phone and laptop, rather than having its contents copied and her phone returned to her. *Cf. United States v. Smith*, 673 F. Supp. 381, 404 (S.D.N.Y. 2023) ("[U]nlike in the typical case of delay following a warrantless seizure, [the defendant] was not actually deprived of his use of his phone or the data stored on it, since the Government returned the original to him after it copied its contents. That makes this a different case from the Second Circuit's decision in *Smith*, where the police had seized a suspect's iPad, thereby depriving its owner of its use.") This factor therefore also strongly weighs in favor of suppression.

As to the third factor, the defendant's reduced property interest, *Smith* considered whether the defendant was an owner or co-owner, or voluntarily relinquished the device. *Smith*, 967 F.3d at 208. The existence of probable cause is also relevant to this factor but "far from dispositive." *Id.* at 209. Here, Defendant Fox was the owner and did not voluntarily relinquish her device, and the Government does not argue that there was probable cause when

the phone was seized. Therefore, the court finds that this factor weighs in Fox's favor.

When discussing the fourth factor, justification for the delay, the Second Circuit stated that:

> The fact that a police officer has a generally heavy caseload or is responsible for a large geographical district does not without more entitle the officer to wait without limit before applying for a warrant to search an item that the officer has seized. That is because the Fourth Amendment imposes a time-sensitive duty to diligently apply for a search warrant if an item has been seized for that very purpose, and all the more so if the item has been warrantlessly seized. The police may not overlook this duty to attend to other matters for which the Constitution imposes no such time-sensitive duty unless there are important reasons why other matters must take priority. "After seizing an item without a warrant, an officer must make it a priority to secure a search warrant that complies with the Fourth Amendment." *Smith*, 967 F.3d at 210 (quoting *Burgard*, 675 F.3d at 1035.)

The Government has not presented any rationale for the delay or why, once the phone was in Agent Shapiro's possession, he did not "diligently apply for a search warrant" or otherwise "make it a priority to secure a search warrant that complies with the Fourth Amendment." *Id.* It was only after Fox's request for her devices back that he applied for the warrant. This factor therefore strongly supports a finding of unreasonable delay.

Thus, the unreasonable delay in applying for the warrant independently violated Fox's Fourth Amendment rights such that suppression of the forensic search and search of the laptop is warranted.

### E.  Summary of Fourth Amendment Issues

In sum, the seizure and subsequent search of Defendant Fox's phone was not a permissible border-search. It therefore required a warrant. Even if a border search, at least reasonable suspicion would be required to search the phone, given Defendant Fox's heightened privacy interests in her cellphone. While there was reasonable suspicion that Fox had engaged in prior criminal activity, the search would still be unreasonable, however, because the search was outside the scope of the type of investigatory search that this standard would authorize. Finally, Agent Shapiro acted with unreasonable delay in applying for the warrant to search Fox's phone under *Smith*.

The court acknowledges the ongoing debate concerning the proper scope of the border-search exception when cell phones are at issue, but the question of whether there was a violation here is not close. At every stage, Agent Shapiro showed no concern for Defendant Fox's Fourth Amendment rights when directing seizure of her phone, searching the phone, and later applying for a warrant to more thoroughly search the phone. Rather, he appears to have attempted to use the border-search exception to shirk the warrant requirement that otherwise applies to cellphones when there was no nexus between the search and the justifications for this claimed exception. This search was therefore not reasonable and violated Defendant Fox's Fourth Amendment rights.

### F.  Good-Faith Exception to the Exclusionary Rule

The court next considers, given the violation of Defendant Fox's Fourth Amendment rights, whether suppression is warranted under the exclusionary rule.

"The Fourth Amendment itself contains no provision expressly precluding the use of evidence obtained in violation of its commands; rather, the Supreme Court has established an

exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *United States v. Lauria*, 70 F.4th 106, 120 (2d Cir. 2023). Suppression's purpose is not to redress the constitutional injury or confer a right on the defendant. *United States v. Raymonda*, 780 F.3d 105, 117- (2d Cir. 2015). Rather, its sole purpose is to "deter future Fourth Amendment violations." *Id.* The exclusion of evidence collected in violation of the Fourth Amendment is the means of deterring such misconduct. *United States v. Jones*, 43 F.4th 94, 110 (2d Cir. 2022) *See also* Friendly, *The Bill of Rights as a Code of Criminal Procedure*, 53 CALIF. L. REV. 929, 951 (1965) ("The beneficent aim of the exclusionary rule to deter police misconduct can be sufficiently accomplished by a practice . . . outlawing evidence obtained by flagrant or deliberate violation of rights.").

Accordingly, courts will only suppress evidence when the deterrence value outweighs the "heavy toll on the justice system" that results from exclusion of relevant evidence. *Jones*, 43 F.4th at 110; *see also United States v. Julius*, 610 F.3d 60, 66-67 (2d Cir. 2010) (describing this as a "cost/benefit analysis" considering the benefit of the "deterrent effect of applying the exclusionary rule" and the "cost of the rule's application").

There are two circumstances where the good-faith exception to the exclusionary rule always applies: (1) when the search is conducted in "objectively reasonable reliance on binding appellate precedent," *Davis*, 564 U.S. at 232; and (2) when the search is conducted in "objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). In both cases, a defendant whose Fourth Amendment rights were violated will not be able to exclude evidence.

Absent these two circumstances, evidence will still not be excluded when the relevant officer that violated the defendant's rights acted with "an objectively reasonable good-faith belief that their conduct [was] lawful." *Raymonda*, 780 F.3d at 18; *see also*

*Zodhiates*, 901 F.3d at 143. In practice, this means that courts will only exclude evidence when officers "exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) (internal quotation marks and citation omitted). Simple, isolated negligence of a law enforcement officer is not enough to warrant exclusion. *In re 650 Fifth Ave. & Related Properties*, 934 F.3d 147, 162-63 (2d Cir. 2019). The law enforcement officer must generally have had knowledge, or could have properly been charged with knowledge, that the search violated the Fourth Amendment and their conduct must reasonably be considered flagrant. *Herring*, 555 U.S. at 143.[34]

Applying this standard here, the court finds: that there was not binding precedent that authorized the search; that there was not good faith reliance on a warrant issued by a neutral magistrate who considered the issue with all relevant facts; and that the officer did not act with an "objectively reasonable good-faith belief that [his] conduct [was] lawful." *Zodhiates*, 901 F.3d at 143. The court thus finds that exclusion is warranted because it is necessary to deter future Fourth Amendment violations and that the deterrence value outweighs the cost of suppression of relevant evidence. *See Lauria*, 70 F.4th at 121.

---

[34] The bar is high given the significant social costs of suppression, but exclusion does not require a violation of "clearly established law," *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (reviewing the qualified immunity standard), or exclusion only when searches are "egregiously unreasonable." *Davis*, 564 U.S. at 259-60 (Breyer, J., dissenting). This may be where the case law on this issue is trending, *id.*, but the court rules on the case law as it stands, not on where it appears to be headed. *See Packer on behalf of 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*, No. 23-367, 2024 WL 3092561, at *1 (2d Cir. June 24, 2024) ("[A] District Court must follow controlling precedent—even precedent the District Court believes may eventually be overturned—rather than preemptively declaring that our caselaw has been abrogated.")

1.   Manual Search: Reliance on Binding Precedent or Warrant

The good faith exception applies where the relevant officer acted with an "objectively reasonable reliance on binding appellate precedent." *Davis*, 564 U.S. at 232. Binding precedent in this case refers to the precedent of the Second Circuit and the Supreme Court. *See S.E.C. v. Dorozhko*, 574 F.3d 42, 46 (2d Cir. 2009).[35]

Here, the existing precedent concerning the border-search exception was reviewed above. In reviewing precedent, the court found that the search did not fall under the border-search exception and that, even if it did, the warrantless search of the cell phone was unreasonable. There has been no change in binding precedent since the search in December 2021 such that the officer can claim reliance on then-existing binding precedent. *Cf. United States v. Zodhiates*, 901 F.3d 137, 143 (2d Cir. 2018) (finding that good-faith exception to the exclusionary rule applied to warrantless subpoena of cell records due to reliance on binding precedent prior to the Supreme Court's decision in *Carpenter*). Therefore, reliance on binding appellate precedent is inapplicable.

And while the subsequent forensic search of the phone and search of the laptop were conducted pursuant to a warrant, the initial manual search was not.

---

[35] The court notes that although CBP officers took Defendant Fox's phone at MIA, all relevant acts were done at the direction of Agent Shapiro while he was in the Eastern District. He opened the investigation into Fox, directed CBP to seize the phone, he requested the phone be delivered to him, he alone searched the contents of the phone, and he applied for the search warrant using the contents of the phone to demonstrate probable cause. The court finds that precedent in the Second Circuit rather than the Eleventh Circuit is the proper precedent in considering the officer's actions. The parties do not raise this issue and instead focus their review of the relevant law on the Second Circuit. (*See generally* Mot.; Opp.; Reply; Oral Argument Tr.)

The court therefore turns to whether the deterrence benefits of suppression outweigh the social costs. *See Julius*, 610 F.3d at 66-67 (noting the "cost/benefit analysis" district courts are required to conduct when determining whether the exclusionary rule will apply).

2.    Manual Search: Deterrence Value and Costs of Suppression

In considering the deterrence value of suppression, the court considers whether the initial manual search by Agent Shapiro was made "with an objectively reasonable good-faith belief that [his] conduct [was] lawful." *Davis*, 564 U.S. at 238. The focus is on the search "in light of all of the circumstances," *Herring*, 555 U.S. at 145, and Agent Shapiro's culpability, including whether he showed a deliberate, reckless, or grossly negligent disregard of Defendant Fox's Fourth Amendment rights. *Jones*, 43 F.4th at 110-11 ("Police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system"); *see also Davis*, 564 U.S. at 236. The court also considers whether Agent Shapiro violated Fox's Fourth Amendment rights to secure a "strategic advantage" in the investigation or prosecution. *United States v. Smith*, 967 F.3d 198, 212 (2d Cir. 2020) (citing *United States v. Stokes*, 733 F.3d 438, 443-44 (2d Cir. 2013)). In considering culpability, the analysis is an objective one, "not an inquiry into the subjective awareness of [the relevant] officers." *Herring*, 555 U.S. at 145.

The court finds that Agent Shapiro's conduct exhibited at least a reckless or grossly negligent disregard of Defendant's Fourth Amendment rights. While the scope of the border-search exception is unsettled, its invocation does not reflexively lead to a finding that the officer "act[ed] with an objectively reasonable good-faith belief that [his] conduct [was] lawful." *Zodhiates*, 901 F.3d at 143 (citing *Davis*, 564 U.S. at 238).

43

The search did not meet any of the justifications of border searches. As reviewed *supra*: the search was planned while Fox was residing in the United States where her phone was not subject to seizure, which led Shapiro to set up a record to be notified of her travel to be able to seize the device; the seizure was directed far in advance of *when* the phone was seized; the seizure occurred far from the border *where* the phone was seized; the search occurred days later; CBP officers did not conduct the search; the search was for evidence of domestic fraud of the PPP program rather than for contraband or evidence of contraband; Fox was a United States citizen so an interest in keeping individuals outside the country was not applicable; the scope of the search was outside the bounds of what reasonable suspicion would allow; there is no indication Fox was dangerous or that criminal activity was afoot; and there is no indication that criminal activity occurred abroad.

The direction of the seizure appeared to be a "deliberate, tactical choice" to evade the warrant requirement that would otherwise apply to search of the contents of Defendant Fox's cellphone. *See Stokes,* 733 F.3d at 443-44. Agent Shapiro set up an alert to be notified of Defendant Fox's travel while she was located in the United States; he directed the seizure only after receiving the alert; and the investigation was in its early stages, without impending charges.

The search was also of Fox's phone, a device which the Supreme Court has made clear since *Riley* implicates significant privacy interests and may require a warrant even when an exception to the warrant requirement would otherwise apply. And while it is unclear exactly what on the phone was searched, the search included at least a review of cell phone text and WhatsApp messages with close friends over a six-month period. (Aff. in Support of Warrant ¶¶ 32-42 (reviewing messages from between March 2021 and July 2021).)

Agent Shapiro's deliberateness, or at least recklessness or gross negligence, is also supported by his using the evidence gathered from the phone to apply for a warrant for forensic searches of the phone and laptop without disclosing details that would indicate the search was anything but a standard seizure by CBP. As discussed *infra,* Shapiro demonstrated awareness of the border-search exception, (Aff. in Support of Warrant ¶ 29 n.1 (citing border-search cases)), but he omitted key details that would inform the magistrate of the propriety of the search, making it appear as if the phone was seized by CBP in the ordinary course of their border duties.

Finally, even when he received the phone, Agent Shapiro showed no diligence in applying for a warrant to limit the intrusion on the Defendant's possessory interests in her phone. *See Smith,* 967 F.3d at 205.

On review of the search and seizure in light of all of the circumstances, Agent Shapiro's conduct was sufficiently culpable because he displayed a reckless disregard of Defendant's Fourth Amendment rights. *See United States v. Rosa,* 626 F.3d 56, 64–65 (2d Cir. 2010). The value of deterrence here is therefore significant. *See Herring,* 555 U.S. at 143 ("The extent to which the exclusionary rule is justified by deterrence principles varies with the culpability of the law enforcement conduct.").

The social costs of exclusion of relevant evidence are always high. *Jones,* 43 F.4th at 110-11 (noting that the exclusionary rule "applies only where its deterrence benefits outweigh its substantial social costs"); *see also United States v. Hightower,* 950 F.3d 33, 36 (2d Cir. 2020) ("Because the rule is prudential rather than constitutionally mandated, it is applicable only where its deterrence benefits outweigh its substantial social costs."). These costs are typically categorized as costs to "truth and public safety." *Davis,* 564 U.S. at 232; *see also* United States v. Julius, 610 F.3d 60, 66 (2d Cir. 2010) ("The principal cost of applying the rule is, of

course, letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system.").

The court thus finds the costs here to be high but notes that there are several mitigating factors. First, due to the other defendants' lack of standing reviewed *infra*, the suppression of evidence applies to just one of the five co-defendants. Second, the crime at issue, while serious, does not involve allegations of violence or child abuse, as it did in other recent cases considering the border-search exception, *cf., e.g., United States v. Smith*, 673 F. Supp. 3d 381, 389 (S.D.N.Y. 2023) (noting allegations of violence in maintaining a conspiracy to control an industry); *United States v. Gavino*, No. 22-CR-136 (RPK), 2024 WL 85072, at *6 (E.D.N.Y. Jan. 7, 2024) (noting allegations of possession of child pornography based on evidence found when the individual was suspected of narcotics trafficking), or cases implicating the Government's heightened interests at the border such as narcotics trafficking or terrorism activity. This case involved fraud isolated to the Paycheck Protection Program which ceased operating in May 2021 and was notoriously vulnerable to fraud given the speed with which it was established to support the struggling economy during the COVID-19 pandemic. *See* SBA OIG, 22-13, *SBA's Handling of Potentially Fraudulent Paycheck Protection Program Loans*, at 1-3 (May 26, 2022) (reviewing the "unprecedented fraud levels" attendant to the PPP program). While the court does not underrate the high costs of suppression, weighing the deterrence value against the social costs to truth and public safety implicates the severity of the allegations which are comparatively lower in this case.

In sum, the value of deterrence significantly outweighs the high cost of exclusion. Therefore, for the reasons discussed, the court finds that the good faith exception does not apply to the initial manual search of the cellphone.

### 3.  Forensic Search: Reliance on Warrant

Twenty-seven days after CBP seized Fox's phone and laptop, Agent Shapiro used evidence obtained from the phone's manual search to apply for a warrant authorizing a forensic examination of the devices.

"[W]here a search is conducted pursuant to a judicially authorized warrant, a presumption of validity obtains with respect to the affidavit supporting the search warrant." *United States v. Lauria*, 70 F.4th 106, 124 (2d Cir. 2023. However, there are "at least four circumstances where reliance on an invalid warrant is unreasonable: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *In re 650 Fifth Ave. & Related Properties*, 934 F.3d 147, 162 (2d Cir. 2019).

The first of these circumstances, where the magistrate was knowingly misled, is at issue here. If law enforcement knowingly, recklessly, or with gross negligence[36] failed to provide a full account of the material facts such that the issuing magistrate did not have enough information to "decide whether [law enforcement's] conduct was sufficiently illegal and in bad faith as to preclude a valid warrant," the good faith exception does not apply. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir.), *on reh'g*, 91 F.3d 331 (2d Cir. 1996); *see also United States v. Raymonda*,

---

[36] The Second Circuit generally "equate[s] gross negligence with recklessness" as both focus on circumstances where the relevant individual "has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." *United States v. Raymonda*, 780 F.3d 105, 123 (2d Cir. 2015) (Chin, J. concurring) (citing *Poe v. Leonard*, 282 F.3d 123, 140 n. 14 (2d Cir.2002)).

780 F.3d 105, 119 (2d Cir. 2015) (applying the gross negligence standard). "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance" on a subsequently invalidated warrant. *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992). There are thus two components to this analysis: materiality (whether Shapiro materially misled the magistrate) and knowledge (whether Shapiro made these omissions knowingly, recklessly or with gross negligence). *See Reilly*, 76 F.3d at 1280-81.

As to materiality, the search conducted pursuant to the warrant is intertwined with the manual search the court found unconstitutional. In this context, where the affidavit relied on evidence discovered in violation of a defendant's Fourth Amendment rights, the court asks whether the issuing magistrate was apprised of the relevant conduct such that the magistrate was able to make "a valid assessment of the legality of the warrant that he was asked to issue." *Id.* at 1280; *see also United States v. Ganias*, 824 F.3d 199, 222-23 (2d Cir. 2016) (en banc).

As to knowledge, the good faith exception will not apply when an officer "knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause." *Golino v. City of New Haven*, 950 F.2d 864, 871 (2d Cir. 1991), *cert. denied*, 505 U.S. 1221 (1992). Thus, the officer must have acted deliberately, recklessly, or with gross negligence in omitting relevant information or submitting misleading information in a search warrant affidavit. *Raymonda*, 780 F.3d at 119; *see also Davis*, 564 U.S. at 238 ("When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the benefits of exclusion tend to outweigh the costs."). "In the context of the good faith exception to the exclusionary rule, the [recklessness and gross negligence] inquiry is . . . whether the law enforcement officer, with reason to know that a search warrant will issue, executes an affidavit in conscious disregard of the

truth and with heedless indifference to the subject's Fourth
Amendment rights." *Raymonda*, 780 F.3d at 123 (Chin, J. con-
curring). When information is "clearly critical" to assessing the
legality of a search, recklessness can be inferred. *Reilly*, 76 F.3d
at 1280.

Two Second Circuit cases, *United States v. Thomas* and *United
States v. Reilly*, illustrate how courts consider law enforcement
omissions or misrepresentations in a warrant application when
considering good faith. In *Thomas*, the Circuit found that the ev-
idence in support of a warrant was procured using an
unconstitutional "canine sniff" of an individual's dwelling for nar-
cotics. *United States v. Thomas*, 757 F.2d 1359, 1366-68 (2d Cir.
1985). If excising from the warrant the evidence that resulted
from this unconstitutional canine sniff, there would not have
been probable cause providing a sufficient basis for the issuance
of a search warrant. *Id.* at 1368. However, the Circuit did not
suppress the fruits from the search warrant because the officer
was transparent in noting that the canine sniff was the basis for
the warrant. *Id.* The Circuit noted that:

> The DEA agent brought his evidence, including the positive
> "alert" from the canine, to a neutral and detached magis-
> trate. That magistrate determined that probable cause to
> search existed, and issued a search warrant. There is nothing
> more the officer could have or should have done under these
> circumstances to be sure his search would be legal. The mag-
> istrate, whose duty it is to interpret the law, determined that
> the canine sniff could form the basis for probable cause; it
> was reasonable for the officer to rely on this determination.
> *Id.*

There was no social benefit in deterring a law enforcement agent
who acted properly, so the good-faith exception applied to the
evidence seized pursuant to the warrant. *Id.*

In contrast, in *Reilly*, the officers failed to provide material facts of the legality of their search. The officers reasonably knew that "curtilage was protected by the Fourth Amendment"[37] and that the "boundaries of curtilage are naturally and necessarily imprecise." *Reilly*, 76 F.3d at 1281 (emphasis added). The officers then undertook a search that "caused them to invade what they could not fail to have known was *potentially* Reilly's curtilage." *Id.* (emphasis added). When applying for a warrant based on information gathered from this search, the officers did not include relevant facts to the determination of whether the search caused the officers to invade the defendant's curtilage and therefore violate the suspect's Fourth Amendment rights. *Id.* at 1280. Instead, they "presented only a bare-bones description" of the relevant land, "a description that was almost calculated to mislead." *Id.* Because the omitted information, such as the layout of the land, was "crucial," the "issuing judge could not possibly make a valid assessment of the legality of the warrant that he was asked to issue." *Id.* Therefore, although the magistrate issued the warrant, the good faith exception did not apply because it does not protect "searches by officers who fail to provide all potentially adverse information to the issuing judge." *Id.* Distinguishing from *Thomas*, the *Reilly* court found it relevant that "the officers are themselves ultimately responsible for the defects in the warrant." *Id.* at 1281.

Here, in reviewing the affidavit submitted by Agent Shapiro in support of the search warrant, the court finds that the omissions were material and that he was reckless in omitting such information.

The affidavit in support of the search warrant omitted key details that indicate that this was not a routine border search such that recklessness or gross negligence can be inferred. *Reilly*, 76 F.3d

---

[37] Curtilage refers to the area immediately surrounding a house. *See United States v. Dunn*, 480 U.S. 294, 300-01 (1987).

at 1280. The affidavit did not note: that the investigation had been ongoing for months prior to Fox's flight and that the direction to seize Fox's phone was part of an inquiry that began in July 2021 and an investigation opened in September 2021;[38] that Shapiro set up a record to be notified of Defendant Fox's travel the month before Fox's flight; that the direction and the seizure was made to assist with the investigation into domestic financial fraud; that CBP "found" Fox to possess the phone because Shapiro requested it; that Shapiro directed CBP to send the phone to him in New York; or that no search by CBP or any other law enforcement agency occurred while the phone was in MIA. Instead, Shapiro adopts passive voice to state that "[d]uring a screening" by CBP officers, Fox "was found to possess" the devices, and then states that after the screening, "HSI acquired custody" and shipped them to HSI to facilitate the manual search. (Aff. in Support of Warrant ¶¶ 28-29.)

The affidavit does provide dates that indicate that a manual review of the phone was conducted three days later after it was shipped to New York, (Aff. in Support of Warrant ¶¶ 28-29), which factored into this court's finding that the search did not properly fall under the border-search exception.

But apart from this fact, the affidavit provides only a "only a bare-bones description" of the search, *Reilly*, 76 F.3d at 1280, with the details surrounding the search and seizure making up only two of the seventy-one paragraphs of the affidavit. Agent Shapiro was not required to detail the entirety of the circumstances relating to his search, but the omissions here were material because they were necessary for the magistrate to consider the search's legality under the border-search exception. This court in fact now relies on these omitted facts to determine that the search was not a

---

[38] Shapiro Decl. ¶¶ 5, 11.) Instead, the timeline in the investigation appears to begin on November 13, 2021, when Fox arrived at the airport. (Aff. in Support of Warrant ¶ 28.)

proper border search. *Cf. United States v. Smith*, 673 F. Supp. 3d 381, 403 (S.D.N.Y. 2023) (finding that the good faith exception applied in a motion to suppress evidence gathered from a border search of a phone where there was "no suggestion that government agents concealed any relevant facts from" the issuing magistrate and that they instead "disclosed precisely those facts that now lead this Court to conclude the initial border search was unlawful in their application for a warrant"). The omitted facts' materiality is also supported by the uncertainty as to the legality of the border-search exception in this context. As discussed: there was not a nexus between the search and the justifications underpinning the exception; and the search related to a cellphone, a device in which a person has privacy interests that are substantially greater than interests in other personal items and where traditional exceptions to the warrant requirement may not apply, *Riley*, 573 U.S. at 393-97.[39] In such a context, the extent to which the border-search exception permitted Shapiro's initial search was at least uncertain such that he had reason to know that he was "potentially" infringing on Defendant Fox's Fourth Amendment rights. *See Reilly*, 76 F.3d at 1281. Even if the search was not "clearly illegal," Agent Shapiro was thus required to provide the magistrate with additional information about this search. *Id.* at 1281-83.

At the same time as omitting these facts, the affidavit included conclusory statements of law to imply that the phone was seized pursuant to a standard border search. For instance, the agent noted that the information was gathered from "a manual review pursuant to the agency's border-search authority," (*id.* ¶ 29), and that the devices are in the "lawful possession of HSI, incident to

---

[39] "[A] cell phone search would typically expose to the government far more than the most exhaustive search of a *house*: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is." *Id.* at 396-97.

a lawful border search." (*Id.* ¶ 54.) Shapiro included these statements while expressing knowledge of existing border search doctrine, including by citing to case law where courts distinguish between manual and forensic border searches and noting that the "Second Circuit has not opined on this issue." (*Id.* ¶ 29 n.1.) It is at least reckless or grossly negligent that critical facts that would rebut the impression that this was a standard search were omitted.

If the information gleaned from the manual search was excised from the affidavit, there would not have been probable cause to authorize the more extensive search. Shapiro summarized the evidence presented to establish probable cause to search the devices as follows:

> Because Fox and her co-conspirators have filed PPP loan applications and successfully received [Economic Injury Disaster Loans]; because a manual review of the CELL-PHONES reveals numerous conversations about creating fraudulent loan applications (sometimes with applicant materials of "lists" of individuals affiliated with at least Parker), forging related financial records, and receiving fees for that misconduct; and because Fox's statements confirm that she uses both DEVICES to perform her business and make money, there is probable cause to conclude that information stored on the DEVICES will include evidence, fruits, and instrumentalities of the Subject Offenses. (*Id.* ¶ 53.)

If removing the information found during the manual review, *see Thomas*, 757 F.2d at 1367, the evidence remaining is just that Fox and her co-conspirators received funds from the Paycheck Protection Program and that Fox used the seized devices to "make money." (Aff. in Support of Warrant ¶ 53.) This is insufficient to support probable cause.

As to recklessness or gross negligence, this can be inferred from the omission of critical details in the affidavit which demonstrate

a deliberate disregard for Defendant Fox's Fourth Amendment rights. *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). Shapiro omitted key details to imply that the search was a routine border-search and indeed represented that the search was a law-ful application of the border-search exception, indicating his general knowledge of the legality of a typical border search. (Shapiro Aff. ¶¶ 54-55.) Given his awareness of the general law concerning the exception, Shapiro would recognize that the con-text in which he directed the seizure of the phone and conducted its search was pushing the limits of what is reasonably authorized under the border-search exception. In such circumstances it is in-cumbent on him to be forthright with the neutral magistrate. *See Reilly*, 76 F.3d at 1280-81 (finding an intent to mislead by omit-ting key details in an area of law where the boundaries of the Fourth Amendment are unsettled). Instead, a review of the affi-davit indicates that Agent Shapiro "with reason to know that a search warrant will issue, execute[d] an affidavit in conscious disregard of the truth and with heedless indifference to [Defend-ant Fox's] Fourth Amendment rights." *See Raymonda*, 780 F.3d at 123 (Chin, J. concurring).

His recklessness is also supported by the broader context in which he acted—that he appeared intent on using the border-search exception as a means to strategically evade the need to apply for a warrant to search the phone for a domestic investiga-tion and that he maintained possession of the phone for weeks afterwards.

Taken together, his actions demonstrate at least recklessness or gross negligence in violating Defendant Fox's Fourth Amendment rights. Therefore, the good faith exception does not apply to forensic search of Fox's phone and laptop.[40]

### 4. Forensic Search: Unreasonable Delay

Finally, the good-faith exception also does not apply to the forensic search of the phone and laptop, conducted pursuant to the warrant, because of Agent Shapiro's unreasonable delay in applying for the warrant. *United States v. Smith,* 967 F.3d 198, 211 (2d Cir. 2020).

In *Smith,* the Second Circuit "stated and clarified principles [ ] that shall guide law enforcement officers with respect to what circumstances establish an unreasonable delay under the Fourth Amendment." *Id.* at 213. Specifically, the Circuit stated that:

> We have discussed how the length of delay has independent weight as a factor and how a delay of one month or more is ordinarily too long for an officer to apply for a warrant. We have described how seizure of personal electronic storage and communication devices must be given heightened consideration in terms of the defendant's interests. And we have

---

[40] The court finds that a hearing is not necessary to make this finding. *See Franks v. Delaware,* 438 U.S. 154, 155–56 (1978) ("[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."). The parties also agree that because the key facts are not in dispute, a hearing is not necessary to resolve the Fourth Amendment issue. (Reply at 2; *see also* Opp. at 12 (citing *In re Terrorist Bombings of U.S. Embassies in E. Africa,* 552 F.3d 157, 165 (2d Cir. 2008)); Oral Argument Tr. at 20:3-7 (noting that there's not a *Franks* issue or *Franks* motion). The court finds that the declarations from all relevant individuals as well as the affidavit submitted in support of the warrant are sufficient to rule on this issue.

explained how the general press of police business may not justify a lengthy delay absent particular evidence showing why other police duties reasonably took precedence. *Id.*

The Circuit then directed that "[t]hese principles shall likewise inform the application of the exclusionary rule in future cases." *Id.* Despite this clear precedent, Shapiro acted in such a manner that each of the four *Smith* factors indicate he unreasonably delayed applying for a warrant. *See supra.* Therefore, under the principles reviewed in *Smith,* exclusion of the information gleaned from the subsequent search is necessary.[41]

### 5. Summary of Good Faith

The court finds that the good-faith exception to the exclusionary rule does not apply to either the initial manual search or the subsequent search conducted pursuant to the warrant issued by the magistrate. Suppression is therefore GRANTED as to Defendant Fox.

### G. Application to Defendants Parker and Flynn

Defendants Parker and Flynn joined Fox's motion to suppress. But because they do not have Fourth Amendment rights in the messages on Fox's phone, their motions are DENIED.

"Despite the deterrent aim of the exclusionary rule, [the Supreme Court has] never have held that unlawfully seized evidence is inadmissible in all proceedings or against all persons." *Rakas v.*

---

[41] The court notes that the warrant was in fact issued despite this unreasonable delay. It is unclear how the good-faith exception may apply based on reasonable reliance on a warrant when an officer acted with unreasonable delay in applying for that same warrant (i.e., it is unclear whether the magistrate could cure this defect). The court's reading of *Smith* is that exclusion is proper under the principles reviewed therein, despite its being granted by the magistrate. Because the court found that suppression of the subsequent forensic search was warranted due to the omission of critical details in applying for the warrant, this issue is not determinative here.

*Illinois,* 439 U.S. 128, 134 n.3 (1978). Rather, "it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." *Id.* at 134. Thus, "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *United States v. Alderman,* 394 U.S. 165, 171-72 (1969); *see also United States v. Beckford,* No. 09-CR-525 DLI, 2012 WL 1980367, at *10 (E.D.N.Y. June 1, 2012) (quoting *Alderman,* 394 U.S. at 171-72).

Put differently, an individual does not have standing to assert the Fourth Amendment rights of a separate individual. *See United States v. Santillan,* 902 F.3d 49, 62 (2d Cir. 2018). Standing requires showing that the individual seeking to suppress relevant evidence "had a reasonable expectation of privacy in the place or object searched." *United States v. Delva,* 858 F.3d 135, 148 (2d Cir. 2017). In the context of electronic data, this requires showing a privacy interest in the data at the relevant time of the search. *See United States v. Ray,* 541 F. Supp. 3d 355, 379-380 (S.D.N.Y. 2021). However, a person does not have a privacy interest in messages they send to third parties. *United States v. Zottola,* No. 18-CR-609 (HG), 2022 WL 3682222, at *6 (E.D.N.Y. Aug. 25, 2022) (citing *Smith v. Maryland,* 442 U.S. 735, 743-44 (1979)).

Defendants Flynn and Parker submitted affidavits asserting that they have privacy interests in Fox's electronic devices subject to the search. Parker notes that as Fox's husband, they shared items on the relevant electronic devices, including financial records and privileged marital communications. (*See generally* Parker Decl.) Flynn notes that as Fox's friend, with whom she shares a "long standing personal and social relationship," she expected that any communications would remain private. (*See generally* Flynn Decl.)

Neither of Fox's co-defendants who join this motion have stand-
ing. Flynn and Parker do not assert that they had a possessory
interest in Defendant Fox's phone or laptop or that they had a
subjective expectation of privacy through their use of these de-
vices. They focus instead on their expectations that records or
communications sent to Fox would remain private. However, in-
dividuals who transmit messages to a separate individual
generally do not enjoy an expectation of privacy once the mes-
sages reach the intended participant. *See Zottola*, 2022 WL
3682222, at *6; *United States v. Lifshitz*, 369 F.3d 173, 190 (2d
Cir. 2004). It is a more difficult question as to whether Parker's
communications during their marriage may be protected by a
reasonable expectation of privacy. But even on this point, the
messages used in support of the affidavit were sent prior to their
August 2021 marriage. (*See* Aff. In Support of Warrant ¶¶ 32-42
(noting messages sent between March and July 2021); Parker
Decl. ¶ 1(noting August 2021 marriage).)

Therefore, because Defendants Parker and Flynn do not have
standing, their motions to suppress are DENIED.

### H.  Defendants' Fifth Amendment Arguments

Because the court grants Defendant Fox's suppression motion
based on her Fourth Amendment argument, it does not reach her
Fifth Amendment argument. If deciding this issue, an evidentiary
hearing would likely be necessary to resolve issues of fact con-
cerning Defendant Fox's detention at the airport and whether this
established custody under *Miranda*. (*See* Reply at 2 (requesting
an evidentiary hearing if the court rejects the Fourth Amendment
arguments).) Unresolved issues that are of particular relevance
here are: whether Fox was free to leave, (Fox Decl. ¶ 7 ("I did not
believe I was free to leave"); Sciaroni Decl. ¶ 23 ("Although we
completed the secondary inspection in the interview room, I did
not require [Fox] to sit and stay in the room")), and the nature
of the questions asked during Fox's detention, (Fox Decl. ¶¶ 5, 8

(stating that the officers were particularly interested in where Fox was living and focused on retrieving her phone to review it for evidence of human trafficking, child pornography, or other contraband); Sciaroni Decl. ¶ 18 (stating that the questions were "standard interview questions for a secondary inspection")). *See United States v. FNU LNU*, 653 F.3d 144, 153-54 (2d Cir. 2011) (reviewing the *Miranda's* custody analysis in the airport context and noting a particular focus on the nature of questions asked); *United States v. Shvartsman*, No. 23-CR-307 (LJL), 2024 WL 1193703, at *30 (S.D.N.Y. Mar. 20, 2024) (reviewing questions one is typically asked at the airport when conducting the *Miranda* custody analysis); *United States v. Kamaldoss,* No. 19-CR-543 (ARR), 2022 WL 1200776, at *8 (E.D.N.Y. Apr. 22, 2022) (noting that the questions must be "so accusatory as to change the very fabric of the encounter" to "transform[] an otherwise non-custodial environment into a custodial one").

## IV. CONCLUSION

Agent Shapiro violated Defendant Fox's Fourth Amendment rights and the good-faith exception to the exclusionary rule does not apply. The court therefore GRANTS Defendant Fox's motion in full. Because Defendants Flynn and Parker do not have standing to assert a violation of their own rights, however, their motions are DENIED.

SO ORDERED.


Dated:    Brooklyn, New York
          July 27, 2024

                              s/Nicholas G. Garaufis
                              NICHOLAS G. GARAUFIS
                              United States District Judge